**BETA ANALYTICS INTERNATIONAL, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Maden Tech Consulting, Inc., Intervenor.**

No. 04–556C.

United States Court of Federal Claims.

Jan. 31, 2007.

Mark L. Shaffer, Shaffer, Bock & Antonoplos, PLLC, Washington, D.C., for plaintiff.

James D. Colt, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and, Kathryn A. Bleecker, Assistant Director, all of Washington, D.C., for defendant.

William L. Walsh, Jr., Venable, LLP, Vienna, Virginia, for intervenor.

## MEMORANDUM OPINION AND ORDER

WOLSKI, Judge.

The matter before the Court is the application of plaintiff Beta Analytics International, Inc. ("BAI" or "Beta") for an award of bid preparation and proposal costs, brought under 28 U.S.C. § 1491(b)(2). The Court had previously determined—after contract performance had already begun—that the government acted arbitrarily and capriciously in awarding a Defense Advanced Research Projects Agency ("DARPA") contract to intervenor Maden Tech Consulting, Inc., see *Beta Analytics Int'l v. United States*, 67 Fed.Cl. 384, 408 (2005) ("*Beta I* "), and ordered a re-procurement to replace this contract. *See Beta Analytics Int'l v. United States*, 69 Fed.Cl. 431, 434–35 (2005) ("*Beta II* "). Beta has applied for a total of $128,382.51 in bid preparation and proposal costs, broken down as follows: $103,759.86 for administrative staff time, labor, and overhead costs; $4,900 in consulting fees; and $19,722.65 for publishing costs. Pl.'s Appl. at 2. For the reasons below, the Court concludes that BAI is entitled to $111,900.82.

## I. BACKGROUND

Beta had been the incumbent contractor performing the predecessor to the contract which was the subject of this case. *See Beta I*, 67 Fed.Cl. at 386. It filed a complaint and a motion for a preliminary injunction with this court shortly before the intervenor was to begin performance under the new contract, and without the benefit of an administrative record (as BAI did not precede this filing with a protest before the United States General Accounting Office, for which a rec-

ord would have been assembled, *see Orion Int'l Techs. v. United States*, 60 Fed.Cl. 338, 343 (2004)). *See Beta I*, 67 Fed.Cl. at 393. Under the handicap of the absence of a record, the motion for a preliminary injunction was denied by the Court, and intervenor assumed the contract a few days later. *Id.*

The case was then placed on a normal schedule for the briefing and argument of motions for judgment on the administrative record. Finding that BAI would have had a substantial chance to receive the contract award had the government not acted arbitrarily and capriciously in evaluating the proposals, the Court requested a joint status report from the parties to address potential remedies. *See id.* at 408. The parties all agreed that a re-procurement should be ordered for a new contract scheduled to begin upon the expiration of the one-year option which had already been exercised. *Beta II*, 69 Fed.Cl. at 432. There was also agreement on a schedule under which BAI would be given the opportunity to apply for bid proposal costs, and the government be given the opportunity to respond. *Id.*

After some delay, BAI submitted its application for bid preparation and proposal costs. The application was supported by three exhibits. *See* Pl.'s Appl. The first was an affidavit from Mr. Fred D. McDougall, BAI's Vice President for Operations. *See* Ex. A to Pl.'s Appl. Mister McDougall explained the work performed by BAI's staff, *id.* ¶¶ 3–8, its consultant, *id.* ¶¶ 9–10, and its publishing company. *Id.* ¶ 11. His affidavit, in turn, contains six exhibits: the list "Staff and Proposal Task Assignments for DARPA Proposal," Ex. A–1 to Pl.'s Appl.;[1] a list of dates and activities entitled "DARPA Proposal Task Work Schedule," Ex. A–2 to *id.;* the agenda from the organizational meeting at which the work on the proposal was planned, Ex. A–4 to *id.;* two spreadsheets re-creating the hours worked to prepare for and write the proposal—one showing each employee's monthly total, Ex. A–3 to *id.,* and the other showing the hours worked by each employee on various tasks, Ex. A–5 to *id.;* and a table showing the effective hourly rates for each

---

1. For the sake of convenience, the Court has adopted the convention of identifying the affida-

vit exhibits—called, for instance, Affidavit Exhibit 1—as Exhibit A–1, A–2, *etc.*

employee who worked on the proposal. Ex. A–6 to *id.* The second exhibit to the application was a set of three invoices from BAI's consultant. Ex. B to *id.* The application's third exhibit was a set of fifteen invoices from its publishing company. Ex. C to *id.*

The government, after some delay, filed its response to BAI's application, arguing that only $3,993.44 in printing costs should be awarded. *See* Def.'s Resp. at 8. After two enlargements of time were granted, BAI filed a reply to the government's response. *See* Pl.'s Reply. Accompanying this reply, and filed under seal, was a binder containing two additional exhibits. The first reply exhibit consisted of 807 pages of material pertaining to the preparation and drafting of BAI's proposal—including some letters and the slides from meeting presentations, Ex. 1 to Pl.'s Reply at 2–4, 9–70, but mostly composed of numerous drafts of the various sections and sub-sections of the proposal. *Id.* at 71–609, 614–804. The second reply exhibit was a table showing the hours worked by each employee on the proposal, this time divided among the three volumes of the proposal and the "organization and administration" category encompassing planning meetings and the like. Ex. 2 to Pl.'s Reply.

The government was then given leave to file a sur-reply, and BAI was permitted to file a response. *See* Def.'s Mot. for Leave to File Sur-reply ("Def.'s Sur-reply"); Pl.'s Resp. to Def.'s Sur-reply ("Pl.'s Resp."). This opinion comes after a careful consideration of the arguments made in the five papers submitted by the parties, and of the exhibits filed in support of the application.

## II. DISCUSSION

### A. Court Authority to Award Bid Preparation and Proposal Costs

It has long been recognized by our court (and its predecessor) that under certain circumstances, bid preparation and proposal costs may be recovered by unsuccessful bidders. Initially, this was the only remedy

available to unsuccessful bidders for the government's breach of an implied-in-fact contract guaranteeing that solicited proposals would be fairly and honestly considered by agency evaluators. *See Heyer Products Co. v. United States,* 135 Ct.Cl. 63, 69–71, 140 F.Supp. 409 (1956). The circumstances justifying such an award first appeared limited to fraudulent, intentionally unlawful procurement activity. *See id.* at 71; *but see Heyer Products Co. v. United States,* 147 Ct.Cl. 256, 258, 177 F.Supp. 251 (1959) (explaining, using broader terms, that there could be no recovery of bid costs if the government was "not fraudulent nor arbitrary nor capricious nor so unreasonable as to necessarily imply bad faith" in its procurement actions). The Court of Claims later explicitly rejected the notion that bid preparation and proposal costs could only be recovered in "situations involving favoritism and discrimination." *Keco Indus. v. United States,* 192 Ct.Cl. 773, 780, 428 F.2d 1233 (1970). The court instead adopted "a broad general rule which is that every bidder has the right to have his bid honestly considered by the Government," *id.,* which protected bidders from ordinary arbitrary and capricious actions. *See id.* at 783–84, 428 F.2d 1233 (holding that allegation that award was made to a bidder whose proposal the government knew would not work as designed and thus might not have been the lowest cost proposal was sufficient);[2] *see also Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1333 (Fed.Cir.2001).

Jurisdiction over bid protests thus initially rested on the Tucker Act grant of power to our predecessor to hear claims founded upon government contracts of the implied variety. The remedy of an award of bid preparation costs declined in importance once the Congress transformed our predecessor into this court and into the United States Court of Appeals for the Federal Circuit—as the Federal Courts Improvement Act of 1982 ("FCIA") amended the Tucker Act to grant

---

**2.** The Court later explained that the factors to be considered in determining if a procurement action were arbitrary, justifying an award of proposal costs, included: whether subjective bad faith was present; the lack of a reasonable basis

for the procurement decision; the amount of discretion officially granted to the relevant decision makers; and whether a statute or regulation was violated. *Keco Indus. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200 (1974).

our court the power to order injunctive relief and other equitable remedies in pre-award bid protests. FCIA, Pub.L. No. 97–164, § 133(a), 96 Stat. 25, 39–40 (1982); *see United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1364–67 (Fed.Cir.1983). With the Administrative Dispute Resolution Act of 1996 ("ADRA"), Congress further amended the Tucker Act, extending our equitable powers to post-award bid protest cases. ADRA, Pub.L. No. 104–320, § 12(a)-(b), 110 Stat. 3870, 3874–75; *see Impresa Construzioni*, 238 F.3d at 1332. The ADRA supplemented (or supplanted[3]) the implied contract cause of action with an express statutory grant of the power to award bid costs, giving our court the authority in bid protest cases to "award any relief that the court considers proper ... except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2). It also expressly incorporated the review standards of the Administrative Procedure Act, 5 U.S.C. § 706, for use in bid protests cases. ADRA, § 12, 110 Stat. at 3875 (adding 28 U.S.C. § 1491(b)(4)); *see Gulf Group Inc. v. United States*, 61 Fed.Cl. 338, 350 (2004).

Even in a post-award context, injunctive relief may often be crafted to provide for the reevaluation of the submitted proposals. *See, e.g., University Research Co. v. United States*, 65 Fed.Cl. 500, 512–15 (2005); *Hawaiian Dredging Constr. Co. v. United States*, 59 Fed.Cl. 305, 316–18 (2004); *Informatics Corp. v. United States*, 40 Fed.Cl. 508, 519 (1998). A reevaluation restores to a victim of arbitrary and capricious procurement activity its substantial chance to receive the contract award. Typically, this would also eliminate the basis for an award of bid preparation and proposal costs, as the investment in the proposal is no longer a "needless expense," *Heyer Products*, 135 Ct.Cl. at 71, 140 F.Supp. 409, and the bidder may yet see the fulfillment of the promise of "fair and impartial consideration" which "induced it to spend its money to prepare its bid." *Id.* at 69, 140 F.Supp. 409. But when, as here,

performance of a contract has begun, or reevaluation is not otherwise practical, bid preparation and proposal costs should be awarded. *See, e.g., CSE Constr. Co. v. United States*, 58 Fed.Cl. 230, 263 (2003); *Dynacs Eng'g Co. v. United States*, 48 Fed.Cl. 614, 620–21 (2001); *MVM, Inc. v. United States*, 47 Fed.Cl. 361, 366–67 (2000). Indeed, the government does not challenge BAI's eligibility for an award of bid preparation costs, in light of the Court's prior finding of arbitrary and capricious conduct, but rather argues that many of the specific costs BAI seeks are not properly substantiated. The Court now turns to a consideration of BAI's application.

**B. Beta's Application for Bid Preparation and Proposal Costs**

■ The Court notes at the outset that the government and BAI seem to agree that this matter is governed, in part, by a Federal Acquisition Regulation ("FAR") definition of "bid and proposal costs" and FAR provisions requiring that allowed costs be "reasonable" and "allocable." *See* Def.'s Resp. at 1, 4 (citing 48 C.F.R. § 31.205–18(a)); *id.* at 2 (citing *S.K.J. & Assocs., Inc. v. United States*, 67 Fed.Cl. 218, 224 (2005)); Pl.'s Reply at 5 (citing 48 C.F.R. § 31.205–18(a)); *id.* at 8 (citing 48 C.F.R. §§ 31.201–3, 31.201–4). Of course, when monetary relief is specifically "limited to bid preparation and proposal costs," 28 U.S.C. § 1491(b)(2), the only costs that may be awarded are those spent for such purposes and thus are, in that sense, "allocable." And it would not seem proper to award more than would be reasonable for those purposes, for the point of relief is not to penalize the government for any idiosyncratic overspending by a bidder. But the Court disagrees with the proffered basis for these commonsense principles.

In particular, the Court does not see how FAR provisions concerning allowable costs under a contract can control the determination of proper monetary relief under the ADRA. When the Federal Circuit employed

---

3. For the latter view, see, *e.g., S.K.J. & Associates, Inc. v. United States*, 67 Fed.Cl. 218, 225–26 (2005); *Lion Raisins, Inc. v. United States*, 52 Fed.Cl. 629, 631 (2002). The Federal Circuit has left this question unsettled. *See Emery World-* *wide Airlines, Inc. v. United States*, 264 F.3d 1071, 1081 n. 9 (Fed.Cir.2001) (declining to decide whether the implied-in-fact theory of recovery survives the ADRA).

these regulations' predecessors in *Coflexip & Services, Inc. v. United States*, it did so because the relevant agency had "stated that all the proposals would be treated in accordance with standard federal procurement regulations," and thus *the terms of the present implied-in-fact contract* incorporate the pertinent provisions of the regulations." 961 F.2d 951, 953 (Fed.Cir.1992) (emphasis added). But when bid preparation and proposal costs are sought under the ADRA amendments to the Tucker Act, there is no implied-in-fact contract into which procurement regulations may be incorporated.[4] Thus, regulations concerning whether certain costs are allowed under a contract would not directly apply to the matter at hand.[5] Moreover, Congress did not delegate to any agency of the Executive branch the power to place substantive limits on the government's liability for bid preparation and proposal costs under the ADRA, *see* ADRA § 12, 110 Stat. at 3874–75, but instead entrusted these determinations to the judiciary, authorizing "relief that the court considers proper." 28 U.S.C. § 1491(b)(2).[6]

This is not to say that the pertinent FAR provisions can never be relevant to the determination of bid preparation and proposal costs.[7] The Court will consider the FAR explanations of "reasonableness," *see* 48 C.F.R. § 31.201–3, and "allocability," *see* 48 C.F.R. § 31.201–4, as useful guidance in determining the proper size of an award of bid

preparation and proposal costs, but holds that these provisions are not authoritative for this purpose. Thus, whether a cost was "incurred specifically" for BAI's proposal, or "can be distributed" to the proposal "in reasonable proportion to the benefits received" in the bid preparation process, will be taken into consideration. *See* 48 C.F.R. § 31.201–4(a), (b); *cf. Coflexip*, 961 F.2d at 953 (citing 41 CFR § 1–15.201–4 (1983)). And the Court will keep in mind the FAR explanation that a claimed cost is "reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." *See* 48 C.F.R. § 31.201–3(a); *cf. Coflexip*, 961 F.2d at 954 (quoting 41 CFR § 1–15.201–3 (1983)).

Before determining the amount of bid preparation and proposal costs proven by BAI, the Court notes, in passing, two aspects of the award application that are not at issue. First, the government has not argued that the total amount of costs sought is, *per se*, excessive. Indeed, when viewed as a percentage of the proposal amount, the total amount of costs on its face does not appear to be unreasonable. *See McCarty Corp. v. United States*, 204 Ct.Cl. 768, 770–71, 777, 499 F.2d 633 (1974) (awarding bid preparation costs that were 0.6% of the bid price). Second, the government does not challenge the hourly rates, burdened to reflect fringe

---

**4.** The decisions of our court which apply the FAR provisions base this on *Coflexip. See, e.g., Lion Raisins*, 52 Fed.Cl. at 631; *S.K.J.*, 67 Fed. Cl. at 224 (citing *Lion Raisins*). For the reasons stated, the Court respectfully disagrees with the reasoning of these decisions.

**5.** The Solicitation included the standard FAR provision regarding protests after award filed with the agency or with the Government Accountability Office ("GAO"), 48 C.F.R. § 52.233–3 (Alternate I), *see* Admin. R. at 141, which references the FAR provisions concerning awards of costs by an agency or at the recommendation of the GAO. *See* 48 C.F.R. § 52.233–3(f) (citing 48 C.F.R. § 33.102(b)(2) and 48 C.F.R. § 33.104(h)(1)). These provisions do not apply to actions in our court, and allow for a broader award than bid preparation and proposal costs. *See* 48 C.F.R. § 33.104(h)(1) (allowing for an award of the cost "of filing and pursuing the protest").

**6.** The Court has some doubt as to whether Congress could delegate to the Executive the substantive power to limit this type of statutory liability. *Cf. White & Case LLP v. United States*, 67 Fed.Cl. 164, 175 n. 15 (2005) (questioning whether deference to an agency's interpretation of a money-mandating statute is appropriate). In any event, such a delegation would in the least require that Congress direct the Executive using "an intelligible principle," *see, e.g., Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928)), and not, as here, *sub silentio*.

**7.** They might, as one example, serve as government admissions in the appropriate context.

benefits and overhead costs,[8] for the individual BAI employees who purportedly worked on the proposal. These rates were taken from submissions "audited and approved by the Defense Contractor Audit Agency." Ex. A to Pl.'s Appl. ¶ 8. Instead, the government argues that BAI failed to sufficiently substantiate the work allegedly performed on the proposal, *see* Def.'s Resp. at 2–7; Def.'s Sur-reply at 4–8, and suggests that the amount of publishing costs claimed was excessive. *See* Def.'s Resp. at 7–8; Def.'s Sur-reply at 7.

### 1. The Inside Costs of BAI's Proposal

According to Mr. McDougall, BAI's Vice President for Operations and the manager of its proposal, eight administrative staff members (including himself) worked on BAI's proposal. *See* Ex. A to Pl.'s Appl. ¶ 4; *see also* Ex. A–1 to *id.* The BAI staff included Arthur Hutchins, the company's President; Joseph Saul, the Executive Vice President; and Palmer Esau, the Chief Operating Officer. Ex. A–1 to *id.* The bid preparation work began in July 2003, after "the Government published the announcement of its intent to issue the solicitation." Ex. A to Pl.'s Appl. ¶ 3.[9] Mister McDougall described the "preparatory tasks" that took place between the date of the announcement and the receipt of the solicitation to include:

> responding to the Contracting Office Solicitation notice that BAI would submit a response to the RFP; identifying the writing team for the proposal; assessing the competition to determine a pricing strategy[; and] holding preparatory meetings for assigned staff to map out strategies to present [BAI's] strengths and address [its] weaknesses, develop winning themes, and develop a proposal development schedule.

*Id.* The bulk of the costs claimed by BAI took place between the receipt of the solicitation on October 17, 2003, and December 5,

2003, when BAI submitted its proposal. *Id.* ¶ 5; *see also* Ex. A–3 to Pl.'s Appl.

Mister McDougall was the individual who "enforced" the schedule adopted by BAI for work on the proposal. Ex. A to Pl.'s Appl. ¶ 6. Because the time cards recording the administrative staff hours of BAI employees "are not broken out by tasks," Mr. McDougall reconstructed the particular hours worked by "staff on the bid preparation and proposal tasks by review of task schedules, tasks assignments, and task completion dates and his personal observations." *Id.* ¶ 8. One attachment to his affidavit lists the eight BAI employees who worked on the proposal, and describes their particular task assignments. Ex. A–1 to Pl.'s Appl. Another attachment lists the work schedule for these tasks, by date and activity. Ex. A–2 to *id.*[10] A third attachment shows the monthly totals of hours worked on preparing the bid proposal, for each employee of BAI, beginning in July 2003, and ending in December 2003. Ex. A–3 to *id.* These hours are also expressed in a spreadsheet which breaks them down by tasks performed by each employee, specified as sub-tasks in the drafting of each of the three proposal volumes; participation in team reviews; and various administrative tasks such as participation in meetings. Ex. A–5 to *id.*

As support materials to corroborate Mr. McDougall's calculation of the hours worked on the proposal, BAI submitted copies of several documents relating to the bid preparation and proposal drafting process. One is an e-mail message from Mr. McDougall dated October 18, 2003, addressed to six of the seven BAI staff members who were to work on the proposal (and also to BAI's consultant), which apparently accompanied a summary of the solicitation. Ex. 1 to Pl.'s Reply at 7. Another is an earlier version of the proposal schedule than the one contained in Exhibit 2 to Mr. McDougall's affidavit. *See id.* at 8. Beta submitted a copy of a slide

---

8. *See* Ex. A–6 to Pl.'s Appl.; Ex. 2 to Pl.'s Reply.

9. *See* Admin. R. at 100 (announcement of procurement, dated July 30, 2003). As the procurement in question was a negotiated one, *see id.* at 101, the solicitation is also referred to as a Request for Proposals, or "RFP."

10. Although this document was given a header identifying it as an exhibit for the costs application, it appears to be a contemporaneous document from the bid preparation process, as the date for completing the draft of Volume III is listed as "TBD." *See* Ex A–2 to Pl.'s Appl.

presentation from a meeting of the BAI staff who worked on the proposal, which identified tasks to be performed by Messrs. Esau, McDougall, Saul, and Hutchins.[11] *See id.* at 48–49, 66–67.[12] The agenda from the October 25, 2003 "Kick-off" meeting to discuss the solicitation and the proposal drafting process was also submitted. Ex. A–4 to Pl.'s Appl.; *see also* Ex. 1 to Pl.'s Reply at 613. This document shows that the meeting was led by Messrs. Esau, Hutchins, and McDougall, and was to last four hours. *See* Ex. A–4 to Pl.'s Appl.; Ex. 1 to Pl.'s Reply at 613. Finally, BAI submitted various drafts showing the evolution of the text and graphics contained in its proposal. Ex. 1 to Pl.'s Reply at 71–609, 614–807.

The government's primary objection to BAI's application appears to be that BAI was not run like a law firm. It argues that BAI's costs are insufficiently documented, quoting the following passage from a Federal Circuit decision concerning the award of attorney fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412:

> [s]ufficient documentation requires 'contemporaneous records of exact time spent [*on the case*], by whom, their status and usual billing rates, as well as a breakdown of expenses such as the amounts spent copying documents, telephone bills, mail costs and other expenditures related to the case.'

Def.'s Resp. at 2 (quoting *Cmty. Heating & Plumbing Co. v. Garrett*, 2 F.3d 1143, 1146 (Fed.Cir.1993)) (emphasis added).[13] The internal quotation comes from another Federal Circuit case concerning an attorney fees application under the EAJA, *Naporano Iron & Metal Co. v. United States*, 825 F.2d 403 (Fed.Cir.1987), which, in turn, was quoting from this court's opinion below. *See Cmty. Heating*, 2 F.3d at 1146 (quoting *Naporano Iron*, 825 F.2d at 404); *Naporano Iron*, 825 F.2d at 404 (quoting slip op. at 7). The original quotation clearly shows the basis for this description of "sufficient documentation": the provision of the EAJA requiring that a party seeking an award of attorney fees and expenses must submit "an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed." 28 U.S.C. § 2412(d)(1)(B); *see Naporano Iron*, 825 F.2d at 404 (quoting portion of slip op. which excerpts 28 U.S.C. § 2412(d)(1)(B)). No similar requirement is contained in the ADRA amendments to the Tucker Act. *See* 28 U.S.C. § 1491(b)(2).

The government also quotes another decision involving a request for attorney fees, this time under the Freedom of Information Act.[14] This opinion, from the Tenth Circuit, contains the proposition that a court may deny fees to a party that fails to produce contemporaneous records. Def.'s Resp. at 2 (quoting *Anderson v. Sec'y of Health & Human Servs.*, 80 F.3d 1500, 1506 (10th Cir. 1996)).[15] This same opinion acknowledges that "a court may award an attorney's fee based on a reconstructed record." *Anderson*, 80 F.3d at 1506. And in its sur-reply, *see* Def.'s Sur-reply at 7 (citing *Lion Raisins*, 52 Fed.Cl. at 633), the government cites an opinion from our court discussing the need for "contemporaneous documentation" to support the request for an award, again, of *attorneys' fees. See Lion Raisins*, 52 Fed. Cl. at 633–34.

---

**11.** In this presentation, a role in the bid preparation process was assigned to someone named "Campbell" (presumably John W. Campbell, BAI's Program Manager under the expiring contract, *see* Admin. R. at 920). Ex. 1 to Pl.'s Reply at 50. Mister Campbell does not figure in BAI's bid preparation and proposal costs application.

**12.** A slide presentation from a senior staff meeting which seemed to concern the anticipated solicitation for another BAI contract which was expiring about the same time—a contract with the Missile Defense Agency, *see* Admin. R. at 940–43—was (apparently) mistakenly included among the documents submitted with the reply brief. *See* Ex. 1 to Pl.'s Reply at 9–43.

**13.** The three words "on the case" were replaced by an ellipsis in the government's brief, which did not identify the passage as one concerning attorney fees. *See* Def.'s Resp. at 2.

**14.** 5 U.S.C. § 552(a)(4)(E).

**15.** The government in both of its papers misidentifies this opinion as one from the Federal Circuit. *See* Def.'s Resp. at 2; Def.'s Sur-reply at 2, 5.

■ Despite the government's claims to the contrary, there simply is no requirement that an applicant for bid preparation and proposal costs support its application with contemporaneous documents akin to a lawyer's billing records. Detailed billing records identifying the time spent on specific tasks developed as a method by which law firms could more efficiently (and verifiably) charge third parties—their clients—for their services. *See* Stephen W. Jones & Melissa Beard Glover, *The Attack on Traditional Billing Practices*, 20 U. Ark. Little Rock L.J. 293, 293–95 (1998) (tracing the history of the billable hour to an American Bar Association study entitled, "The 1958 Lawyer and His 1938 Dollar"); William G. Ross, *The Ethics of Hourly Billing by Attorneys*, 44 Rutgers L.Rev. 1, 11–12 (1991).[16] There is no reason to suppose that the business model which works for the legal profession would prove to be an efficient way for other firms to organize their internal operations. It might be reasonable to expect that a business will require detailed invoices from the third parties which supply it goods or services, as BAI received from its consultant and publisher. *See* Exs. B & C to Pl.'s Appl. But when functions or tasks are handled internally, a business has other means of monitoring and measuring work.[17] The smaller a business, the more likely is the case that close, direct supervision would make the use of detailed time sheets an unnecessary cost and maybe even a counterproductive irritant to worker morale. In any event, BAI is a small company which provides intelligence and security services under a handful of contracts

with the government, *see* Admin. R. at 876, and not a company in the bid proposal writing business. Were it writing proposals for other bidders, perhaps detailed time sheets would be the rational response to consumer demand.[18] But the business should not be penalized for failing to keep records like a law firm.[19]

■ The Court also notes that decisions by the Comptroller General—which our court has found to provide useful guidance in this area, *see, e.g., Impresa Construzioni Geom. Domenico Garufi v. United States*, 61 Fed. Cl. 175, 182–83 & n. 9 (2004) (citing *Planning Research Corp. v. United States*, 971 F.2d 736, 740 (Fed.Cir.1992))—do not require contemporaneous records in awards of bid preparation costs. *See, e.g., Stocker & Yale*, 72 Comp. Gen. 193, 199–201 (May 18, 1993); *Data Based Decisions, Inc.*, 69 Comp. Gen. 122, 126 (Dec. 11, 1989) ("There is no requirement that a protester produce contemporaneous records to establish its entitlement to the award of costs. . . ."). Awards of bid preparation costs have been based on such documentation as a " 'Chronology of Events,' indicating the date various tasks were performed, the nature of the tasks, and the number of hours spent performing the tasks for each employee position." *Tri Tool, Inc.*, 97–2 CPD P 69, 1997 WL 561351, at \*2 (Comp.Gen. Sept.9, 1997); *see also W.S. Spotswood & Sons, Inc.*, 69 Comp. Gen. 622, 623 (July 19, 1990) (finding "a breakdown of the services performed [and] the amount of time spent on each task" was adequate documentation of "the type and amount of work performed"); *Data Based Decisions*, 69

16. *But see* Richard A. Posner, Overcoming Law 60 n. 37 (1995) (noting that "increased competition" was moving lawyers away from an hourly billing regime toward "more competitive and incentive-compatible billing").

17. For a good discussion of the factors influencing the manner in which a business enterprise is organized, including the extent to which functions are contracted out, see R.H. Coase, *The Nature of the Firm, in* The Firm, the Market, and the Law 33–55 (1988).

18. If such records were required before a court could award bid preparation and proposal costs, then offerors might begin keeping detailed time sheets for their employees—if, that is, they determine that the costs of doing so are outweighed by the benefit of receiving such awards, a benefit

that must be discounted to reflect the infrequent nature of these awards. But Congress has not adopted such a requirement, and courts must be careful not to usurp the legislative branch's policymaking role—particularly when the policy imposes costs on the intended beneficiaries of a remedial provision.

19. The Court notes that the solicitation did not even require the contractor which would be performing the requested services to keep detailed time records of the sort the government demands for the bid proposal costs application. *See, e.g.,* Admin. R. at 114–15 (describing contents of "Monthly Management Report"); *id.* at 176 (concerning "Measurement of Provided Services").

Comp. Gen. at 126 (document reconstructing hours worked by company president was adequate except where contradicted by attorneys' billing statements).

Beta's submission of an affidavit from the officer who managed the preparation and creation of its proposal, Ex. A to Pl.'s Appl.—with an attachment describing the tasks performed by each employee, Ex. A–1 to *id.;* spreadsheets identifying the hours worked by each employee by task and by month, Exs. A–3 & A–5 to *id.;* and spreadsheets showing the burdened hourly rates for each employee, Ex. A–6 to *id.; see also* Ex. 2 to Pl.'s Reply—adequately documents the work performed on the proposal by BAI and the cost of this work, under the Comptroller General's standards. Moreover, our court has found that a declaration from an officer of an applicant for bid preparation costs, with a supporting spreadsheet, was adequate to show "the type and amount of work required for the bid and how hourly rates were calculated." *Lion Raisins,* 52 Fed.Cl. at 635 (disallowing the claimed costs because unallowed costs were included in the total in a manner which prevented their segregation). Beta has supported its application with some contemporaneous documentation, including slides from an organizational meeting in which the various bid preparation tasks were described in some detail, Ex. 1 to Pl.'s Reply at 44–70; the agenda from a planning meeting, Ex. A–4 to Pl.'s Appl.; the work schedule for the proposal, Ex. A–2 to *id.;* and several drafts of the proposal—including twelve versions of Volume I, Ex. 1 to Pl.'s Reply at 71–556; two drafts of Volume II, *see id.* at 631–64; and eight drafts of Volume III. *See id.* at 665–770. Additional contemporaneous corroboration may be found in BAI's consultant's invoices, which describe some tasks performed in conjunction with BAI employees. *See* Ex. B to Pl.'s Appl. at 1–2. Taken as a whole, the documentation submitted by BAI provides a sufficient basis upon which this Court may award bid preparation and proposal costs.

■ This does not mean, however, that BAI has carried its burden on every item composing the $103,758.86 in costs claimed for the work of its own employees. The government challenges the costs claimed prior to the issuance of the solicitation in October 2003. *See* Def.'s Resp. at 3–4. It argues that many of the tasks that BAI claims to have undertaken in this time period, such as "assessing the competition," "mapping out strategies," and "highlight[ing the company's] strengths and addressing its weaknesses," have not been explained to be "distinct from the normal prudent course of business as a Government contractor even apart from any RFP that the Government might issue." Def.'s Resp. at 4. As a general matter, there does not seem to be any reason why bid preparation costs should be limited to those incurred after a solicitation has issued. The approach taken by the Comptroller General seems appropriate—allowing costs "incurred in anticipation of competing for the specific contract at issue." *Tri Tool,* 97–2 CPD P 69, 1997 WL 561351, at *2 (recommending costs "incurred after [the bidder] learned of the upcoming procurement").

■ And it may well be the case that an incumbent contractor, as the expiration date of its contract approaches, is in a position to begin preparation work even *before* the government announces an upcoming procurement. But, particularly when an application is based on a reconstruction of hours worked, the Court thinks it advisable to require greater specificity concerning tasks performed prior to the issuance of a solicitation. The Court does not find problematic the pre-solicitation tasks described by Mr. McDougall in his affidavit—they seem necessary if the government is to reap the benefits of price and quality competition.[20] The problem, however, is in the identification of who performed these tasks and when. Only two of the eight BAI employees who worked on the proposal had any pre-proposal preparation tasks described in the documentation—Mr. McDougall, and his direct assistant, J.D. Smith. *See* Ex. A–1 to Pl.'s Appl. But

---

**20.** For a discussion of the results expected from the competitive process, see *Arch Chemicals, Inc.*

*v. United States,* 64 Fed.Cl. 380, 400 (2005).

for the months of July, August, and September, pre-proposal activity is claimed for the following individuals: Carmen Crescenze, twenty hours; Mr. Esau, twenty hours; and Lloyd Luellen, sixteen hours. *See* Ex. A–3 to *id.* While it may well be the case that these individuals began pulling together the information they needed for their portions of the proposal prior to the issuance date— Crescenze compiling cost data or Luellen gathering personnel data, for instance—insufficient documentation has been submitted to establish this fact. Thus, these fifty-six hours are disallowed.

In addition, twenty-eight hours are claimed for Mr. McDougall's work in July 2003. *Id.* Mister McDougall stated in his affidavit that "BAI began its bid preparation work in July 2003, when the Government published the announcement of its intent to issue the solicitation." Ex. A to Pl.'s Appl. ¶ 3. But the record indicates this announcement was made on July 30, 2003. *See* Admin. R. at 100. As was noted above, even some pre-announcement costs may be properly attributed to bid preparation costs when the offeror, such as an incumbent, is aware that a contract will soon expire—but no such costs have been here described. Instead, BAI asserts that the starting point of its work was the announcement—which means that Mr. McDougall is claiming that twenty-eight hours in preparatory work was performed by him over the last two days of July. While such an intense (and productive) period of activity is not unknown to lawyers facing deadlines, in this particular context the claim, without elaboration, appears erroneous. Without a means of segregating time spent on the preparation of the proposal from time that is unrelated, *see Lion Raisins,* 52 Fed. Cl. at 635, the Court disallows these twenty-eight hours.

21. One review team appears to have alternately been identified as either "Pink" or "Blue." *Compare, e.g.,* Ex. A–1 to Pl.'s Appl. (stating Mr. Russell "supported Pink and Red Teams" and that Mr. Saul was a "member of Pink, Red and Gold Team") *with* Ex. A–5 to *id.* (identifying hours spent for Red, Blue and Gold teams).

22. The Court subtracts from the $103,759.86 claimed for BAI's labor, administrative and over-

The Court finds the remainder of the hours claimed by BAI to be adequately documented. The solicitation was dated October 15, 2003, *see* Admin. R. at 101, and was received by BAI on October 17, 2003. Ex. A to Pl.'s Appl. ¶ 5. A summary of the solicitation was distributed to the proposal writing team on Saturday, October 18. Ex. 1 to Pl.'s Reply at 7. The Court notes that ten working days remained for the month of October 2003, and that no BAI employee (other than McDougall and Smith, whose pre-proposal roles were explained, *see* Ex. A–1 to Pl.'s Appl.) was identified as working on the proposal more than eighty hours in October. *See* Ex. A–3 to Pl.'s Appl. The government does not argue that the hours claimed are unreasonable given the size and complexity of the contract involved in this case. And the hours do not themselves appear to be excessive or otherwise unreasonable for the task. After subtracting the eighty-four hours discussed above, the total number of hours claimed by BAI employees was 1,204— roughly the equivalent of seven employees working full-time for one month. Given the tasks performed by each individual, *see* Ex. A–1 to *id.,* and the number of revisions and drafts involved in writing the proposal, *see* Ex. 1 to Pl.'s Reply at 71–609, 614–804, the hours claimed appear reasonable. *See* Ex. A–3 to Pl.'s Appl. The hours range from the twelve performed by William Russell with the Red and Blue review teams,[21] *see* Exs. A–1, A–3, A–5 to *id.,* to the 376 (net of the disallowed amount) worked by Mr. McDougall, the proposal manager. *See* Ex. A–3 to *id.* After reducing the total claim based on BAI's labor and associated expenses by the hours disallowed for McDougall, Crescenze, Esau, and Luellen, this portion of BAI's claim totals $96,943.17.[22] The Court accordingly finds that BAI has proven this amount of inside costs of preparing its proposal, based on the McDougall affidavit and accompanying exhibits.[23]

head costs the following: $2,340.38, for twenty-eight hours of McDougall's time; $1,205.57, for twenty hours of Crescenze's time; $1,813.24 for twenty hours of Esau's time; and $1,457.50, for sixteen hours of Luellen's time.

23. The government submitted nothing that could discredit Mr. McDougall's signed affidavit, such as deposition testimony impeaching his claims, nor did it request a hearing at which he could be

### 2. *The Consultant's Work*

Beta seeks recovery of $4,900, for forty-nine hours of work on the proposal performed by its consultant, Arion Pattakos. It supports this portion of the award application with contemporaneous records, consisting of three signed invoices from Mr. Pattakos, dated November 1 and December 1, 2003, and January 2, 2004. Ex. B to Pl.'s Appl. at 1–3. Mister McDougall's affidavit also explains the work performed by Mr. Pattakos, and identifies the invoice items which concerned the bid proposal. Ex. A to Pl.'s Appl. ¶¶ 9–10. The government challenges the sufficiency of this documentation, arguing that Mr. Pattakos did not authenticate his bills or explain how his records were kept, Def.'s Resp. at 6; that for entries which include more than just work on the proposal, the allocation of hours to the DARPA proposal is not satisfactorily explained, *id.* at 6–7; and that the hours claimed for work on the proposal are an unreasonable percentage of the total work done by Mr. Pattakos. *Id.; see also* Def.'s Sur-reply at 6.

■ The Court rejects the first and third of these objections. The signed invoices are themselves adequate evidence of the work performed by Mr. Pattakos—these are as valid as any receipt for goods or services. Moreover, they are very similar in form to attorney billing records. Each relevant entry contains a description of the work done for BAI on that day, and provides a number for the total hours worked that day. *See* Ex. B to Pl.'s Appl. The government seems to find the invoices questionable because they are monthly bills, rather than photocopies of pages from Mr. Pattakos's daily calendar or small scraps of paper keeping track of his work in real time. But in this respect they are no different from attorney billing records, which take the place of time kept in calendars, in the margins of pages from yellow pads, and the like, and yet are not suspect merely because the time entries, much

less the ultimate print-out submitted to the court, were not conceived instantaneously.

Nor is the ratio of hours worked on the DARPA proposal to other hours billed to BAI of any consequence. Mister McDougall explained that BAI employs Mr. Pattakos "as a Senior Consultant to provide support to the company on strategic direction, proposal support, professional security training and other duties as tasked." Ex. A to Pl.'s Appl. ¶ 9. Because of this "varied" and "wide range of responsibilities," the government concludes it "would be an unreasonable assumption" that Mr. Pattakos "spent the majority of his time on the DARPA RFP *on the days in which DARPA is mentioned.*" Def.'s Resp. at 7 (emphasis added). This objection makes little sense—it is like saying that if someone has six clients, he could not have spent a day doing work for only one of them. The government bases its criticism on the fact that eighty-five hours of work were billed on the days for which DARPA is mentioned in the invoices, and BAI alleges forty-nine of these were for the proposal. *Id.* at 6–7.

It is not clear whether the government's point is that the proposal should be a smaller percentage of the consultant's work for BAI, or should be a smaller percentage of his work concerning BAI's DARPA contract. If the latter, there appears to the Court to be no reason why work on the proposal *wouldn't* be the consultant's dominant concern during that time period. And if the former, then why focus just on the days on which work on the DARPA contract occurred? These invoices bill BAI for 289 hours in total over the three months, and 152 from the date the solicitation was received by BAI (October 17) through the date the proposal was submitted (December 5). The forty-nine hours alleged for proposal work is a much smaller percentage when these denominators are used. And if the government were attempting to question the allocation of hours to the proposal when the invoice contains more than just DARPA work for a given day, it is over-

---

subject to cross-examination. *See, e.g.,* Joint Status Report (Oct. 5, 2005) at 1, 6. The Court also notes that it has determined that minor discrepancies in the support documentation—such as Luellen's hours totaling seventy-six on Ex. A–5 to Pl.'s Appl., and sixty-two on Ex. 2 to Pl.'s Reply,

rather than the fifty-six for which reimbursement is sought, *see* Ex. A–6 to Pl.'s Appl.—do not detract from the overall credibility of the application. *Compare* Ex. 2 to Pl.'s Reply (showing 228 hours for Esau) *with* Exs. A–3, A–5–6 to Pl.'s Appl. (showing 236 hours).

inclusive in its sample, as it includes days when the *only* work billed pertained to the DARPA proposal. *Compare* Def.'s Resp. at 7 n. 1 (identifying entries used to calculate the eighty-five hours) *with* Ex. B to Pl.'s Appl. at 1 (Oct. 25 entry for "DARPA prop kick-off meeting and discussions re anticipated RFPs"), at 2 (Nov. 1, 11, and 22 entries). For the entries containing both work on the proposal and other work, BAI is claiming that eighteen of the forty hours were allocable to the proposal. *See* Ex. A to Pl.'s Appl. ¶ 10; Ex. B to Pl.'s Appl. at 1–3.[24]

■ These entries which combine hours worked on the proposal with other services performed for BAI do raise legitimate questions concerning whether BAI has adequately proven the hours worked on the proposal by Mr. Pattakos. This objection of the government—the second of the three discussed above—does, then, have some force. Although multiple services are performed on various days for which Mr. Pattakos had billed BAI, the invoices themselves contain a column for total hours only. *See* Ex. B to Pl.'s Appl. at 1–3.[25] The descriptions of the services provided do not contain any information regarding the time spent on each task. *See id.* Notes have been written in the left margin of these invoices—including the numbers "2" and "7" next to the October 22 and October 25 entries, respectively, *see id.* at 1; the number "35" at the bottom of the invoice entries for November work, *see id.* at 2; and what may be the number "5" next to the December 1 entry. *See id.* at 3. It is doubtful that these notes were written by Mr. Pattakos at the time the invoices were sent, for the breakdown of hours worked on the proposal would not have had any special significance at that time.

Beta does not explain if these notes are the work of Mr. McDougall or Mr. Pattakos, and, if the former, whether these are based on his recollections or the consultant's. It argues that Mr. McDougall's declaration "break[s] out the hours he believes Pattakos worked on the proposal." Pl.'s Resp. at 6. But while Mr. McDougall stated he was responsible for "determin[ing] the hours worked by the assigned administrative staff," Ex. A to Pl.'s Appl. ¶ 8, he makes no similar claim regarding the consultant's work. Instead, he stated that the consultant's "invoices show Mr. Pattakos' work on the proposal and other tasks," *id.* ¶ 10, and then states the work performed and the hours worked, broken out from other services when necessary, without any claim to be the source of these determinations. *See id.*[26] Moreover, although Mr. McDougall was naturally in a position to observe the work of BAI's staff on the proposal, from his vantage point as proposal manager, BAI has not attempted to establish that the work of its consultant was also performed on-site or otherwise in a manner that was similarly observable by Mr. McDougall.

The defect in this regard is not the lack of contemporaneous documents recording the apportionment of the consultant's work between the proposal and other services. This apportionment may be established subsequent to the events in question. *See Stocker & Yale*, 72 Comp. Gen. at 199 (explaining that an applicant for costs "is not required to produce contemporaneous documentation to support [the] segregation" of unallowable from allowable costs). But neither the McDougall affidavit nor another affidavit explained the breaking out of hours concerning the proposal from other hours contained in the combined entries. Of the combined entries, only two contain hours that Mr. McDougall's affidavit can corroborate: the

---

24. Beta allocates the following portions of Mr. Pattakos's mixed entries to the proposal: two of the four hours from October 22; three of the six from November 3; two of the ten from November 10; four of the eight from November 18; two of the four from November 20; and five of the eight from December 1.

25. Some entries, not relevant here, also combine more than one day of work. *See, e.g.,* Ex. B to Pl.'s Appl. at 1 (entries for October 1–3 and 13–16).

26. Although BAI claims that the itemized hours total forty-nine, the hours detailed in Mr. McDougall's affidavit total only forty-eight. The reason for the difference is that he only identifies thirty-four hours from the December 1 invoice, but claims that thirty-five hours were worked on the proposal during the month that invoice concerned. *See* Ex. A to Pl.'s Appl. ¶ 10.

two hours identified for October 22, which Mr. McDougall claimed "involved a strategy/theme meeting with Palmer Esau and [himself]," Ex. A to Pl.'s Appl. ¶ 10; and the two hours claimed for November 20, which were for a meeting of the "Pink" review team, which Mr. McDougall managed. *See* Ex. B to *id.* at 2; Ex. A–1 to *id.* Beta has not provided sufficient evidence to apportion the hours worked by the consultant on November 3, 10, and 18 and December 1.

The Court finds that BAI has carried its burden and proven the following hours of work on the proposal performed by Mr. Pattakos: two hours on October 22; seven hours on October 25; eight hours on November 1; ten hours on November 11; two hours on November 20; and five hours on November 22. *See* Ex. B to Pl.'s Appl. at 1–2. Accordingly, at the consultant's $100 per hour rate, BAI is entitled to an award of $3,400 for these thirty-four hours.[27]

### 3. Publishing Support Costs

Beta requests an award of $19,722.65 for proposal costs paid to its publishing support service, YOUR Communications, LLC. Pl.'s Appl. at 2. Mister McDougall explains that this work "included design, layout, organization, indexing, and printing tasks." Ex. A to *id.* ¶ 11. The application is supported by fifteen invoices from YOUR Communications. Ex. C to *id.* The government concedes that the fourth, sixth, tenth, eleventh, twelfth, and fourteenth invoices contain charges that can be allocated to the proposal, totaling $3,993.44. Def.'s Resp. at 8. It argues that the other invoices do not adequately describe work performed for the proposal, *see id.* at 7–8, and suggests that the total charge is unreasonable—as $19,722.65 in publishing

costs amounts to an award to BAI of $89.64 per page. *See id.* at 7.[28]

Taking the question of reasonableness first, the government has not sufficiently articulated a reason for suspecting these charges are excessive. The cost per proposal page analysis overlooks the indexing, layout, and graphic design tasks performed by the publishing service, *see* Ex. A to Pl.'s Appl. ¶ 11; *see also, e.g.,* Ex. C to *id.* at 6–9, and provides no reference point for concluding that the total costs are unreasonable. The circumstances surrounding this work, performed by a third party and paid by BAI at a time when an award of bid proposal costs could not have been expected, would seem to make the costs presumptively reasonable. *Cf.* 48 C.F.R. § 31.201–3(b)(2) (FAR provision recognizing presence of arm's length bargaining as a consideration in determining if a cost is reasonable). The government must do more to undermine their reasonableness than merely quote the cost per page. *See Princeton Gamma–Tech, Inc.,* 68 Comp. Gen. 400, 405 (April 24, 1989) (requiring the articulation of a reasoned analysis when determining costs to be excessive); *cf. Data Based Decisions,* 69 Comp. Gen. at 124 (requiring more from the government than a simple conclusion that attorneys' hours are excessive). Examples of occasions when this court, the Comptroller General, or an agency board found publishing support services excessive for a proposal regarding a contract of a comparable size, for instance, could provide a useful yardstick for the government's argument. No information supporting such a standard has been presented to the Court.

■ Concerning the individual invoices, the first two were dated June 12, 2003, Ex. C

**27.** Beta did not request reimbursement of any hours worked on October 20, although the relevant invoice entry includes the following service: "Reviewed DARPA RFP and meet/discuss." Ex. B to Pl.'s Appl. at 1. Nor did it request reimbursement for the seven hours worked on November 4, even though it argues that the consultant "worked exclusively on the proposal" that day. Pl.'s Resp. at 6; *see* Ex. B to Pl.'s Appl. at 2 (November 4 entry describing services as: "Review/comment/discuss Information Assurance prop for DARPA").

**28.** Although the YOUR Communications work entailed more than simply printing the final proposal, the government derived this figure by dividing the total costs claimed for the publishing support service by the 220–page size of the proposal. Even if one viewed the publishing costs as nothing but copying charges, however, the government dramatically overstates the cost per page. Multiple copies of the offerors' submissions were requested by the government, including an original and one copy of each solicitation package, *see* Admin. R. at 101, four copies of the technical proposal, and two copies of the cost proposal. *See id.* at 175.

to Pl.'s Appl. at 1–2, which was well before BAI claims to have begun preparation work in anticipation of the solicitation. *See* Ex. A to *id.* ¶ 3. The third invoice appears to be the bill for the second half of the work billed on the first invoice—"Design and Development—Proposal Binder Covers." *See* Ex. C to *id.* at 1, 3.[29] This invoice is dated July 28, 2003, *see id.* at 3, which was two days before the procurement was announced. *See* Admin. R. at 100. The documentation submitted by BAI shows that the company had been preparing for the new solicitation for its contract with the Missile Defense Agency since October 22, 2002. *See* Ex. 1 to Pl.'s Reply at 15. At the staff meeting discussing the DARPA proposal, which appears to have taken place after the release of the solicitation (for no "pre-RFP activities" are discussed, *see id.* at 44–70), the person or entity to be the "Graphics Artist" for the proposal, tasked with, *inter alia,* "[c]reat[ing] cover and icons" and with "[c]reat[ing] graphics and flow charts," is designated "TBD." *Id.* at 51. Based on the foregoing, the first three invoices—which do not mention the DARPA proposal and pre-date the procurement announcement and BAI's preparation work—cannot be the basis for an award of bid preparation and proposal costs. This is not to suggest that an offeror may never recover costs incurred in anticipation of a solicitation, when these costs pre-date the announcement of the procurement; or that some proportion of costs incurred in preparation for more than one proposal may not be awarded. *Cf.* 48 C.F.R. § 31.201–4(b) (stating a cost is allocable to a contract it "can distributed to [the contract] in reasonable proportion to the benefits received"). But neither case has been made by BAI.

The fifth invoice, dated November 6, 2003, describes the services provided as "[r]ecreation of the NEI logo." Ex. C to Pl.'s Appl. at 5. The word "DARPA" is handwritten on the invoice. *Id.* This invoice apparently references Network Engineering, Incorporated ("NEI"), BAI's subcontractor. *See* Admin. R. at 876. The Court can find no depiction of the NEI logo in any of the drafts of the

proposal, and none has been identified by BAI. Accordingly, this cost is not allowed.

Although the government objects to an award based on the seventh, eighth, ninth, and thirteenth invoices, these clearly relate to the DARPA proposal. The seventh invoice, dated November 10, 2003, concerns graphics and indexing work performed over the first two weeks of that month, when BAI was in the process of drafting the DARPA proposal. *See* Ex. C to Pl.'s Appl. at 7. The next two invoices, dated November 20, 2003, concern graphics and layout design, mention the "BAI draft proposal," and clearly identify several graphics generated for the proposal: "Risk Management," "BAI Corporate Structure," "SID," "5 Step OPSEC," and the "Personnel Matrix." *See id.* at 8–9; *see also* Ex. 1 to Pl.'s Reply at 625–27 (Risk Management graphics); *id.* at 614–15, 622 (Corporate Structure graphics); *id.* at 616–18, 621, 623 (SID charts); *id.* at 628–30 (Five–Step OPSEC graphics); *id.* at 573–76 (Personnel Matrix drafts). The thirteenth invoice, dated December 4, 2003, has as its general description "[g]raphic development from November 20–25, 2003, wrap date on DARPA Proposal graphics," and identifies work on the five aforementioned graphics. Ex. C to Pl.'s Appl. at 13. Beta is entitled to the costs exhibited on these four invoices. *See also* Admin. R. at 878–79, 898, 910, 934 (graphics and tables employed in BAI's final proposal).

The government contends that the fifteenth invoice is among those which "do not mention DARPA or anything else to indicate that they were for tasks related to the proposal at issue in this case." Def.'s Resp. at 7. But this invoice of a trivial amount ($14.21), concerning the shipment of tabs received by BAI on November 26, 2003, states in the "Project" cell that it is for account "# 0046 DARPA Prop." Ex. C to Pl.'s Appl. at 15. Beta can recover this cost, as well.

In summary, BAI has proven publishing support services costs based on the submitted YOUR Communications invoices, with the exception of those costs on the first three

---

29. The second invoice was for the service described as: "Research for Proposal Presentation Packaging." Ex. C to Pl.'s Appl. at 2.

**170**

invoices, and the fifth invoice. Accordingly, it is entitled to an award of $11,557.65 in publishing costs incurred in creating its proposal.

### III. CONCLUSION

For the foregoing reasons, the Court has determined that plaintiff has proven bid preparation and proposal costs consisting of the following amounts: $96,943.17 in staff costs; $3,400 in consultant costs; and $11,557.65 in publishing support costs. Plaintiff is thus entitled to an award of bid preparation and proposal costs totaling $111,900.82. The Clerk of the Court shall enter judgment for plaintiff on its application for bid preparation and proposal costs in the amount of $111,900.82.

**IT IS SO ORDERED.**